UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA,

                        1:18-CR-120 – LJV-MJR

        v.                  REPORT and RECOMMENDATION

DANNY W. MICHAEL, III,

                Defendant.

        This case was referred by the presiding judge, the Honorable Lawrence J. Vilardo, to this Court, pursuant to 28 U.S.C. §636(b)(1), to handle non-dispositive discovery motions and to make a recommendation as to all dispositive motions.

        Before the Court are suppression motions brought by defendant Danny Michael, III ("defendant"). (Dkt. No. 251). The non-dispositive motions made by defendant Michael were addressed by separate Decision and Order of this Court. (Dkt. No. 440). For the following reasons, it is recommended that defendant's motions to suppress evidence and statements be denied.

## BACKGROUND AND PROCEDURAL HISTORY

        On October 4, 2018, a federal grand jury returned a Superseding Indictment charging 16 defendants with 42 counts of criminal conduct. (Dkt. No. 85). Defendant Michael was charged with: (1) conspiracy to possess with intent to distribute 50 grams or more or methamphetamine in violation of Title 21, United States Code, Section 846; (2) three counts of possession with intent to distribute, and distribution of, methamphetamine in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C); (3) two

counts of possession with intent to distribute, and distribution of, 5 grams or more of methamphetamine in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B); (4) two counts of possession with intent to distribute, and distribution of, 5 grams or more of methamphetamine in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C) and Title 18, United States Code, Section 2; (5) felon in possession of a firearm, namely, a Lakefield Mark II .22 caliber rifle bearing serial number 309767, in violation of Title 18, United States Code, Sections 922(g)(1) and 942(a)(2); and (6) possession of a firearm in furtherance of drug trafficking crimes in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and 924(c)(2).

On July 22, 2019, defendant filed a motion seeking suppression of physical evidence and statements. (Dkt. No. 251). The Government filed a response to the motion on August 19, 2019. (Dkt. No. 277). The Court heard oral argument on this motion on September 16, 2019 and an evidentiary hearing was scheduled. Defendant filed an affidavit of standing on September 30, 2019, which he supplemented on December 16, 2019. (Dkt. Nos. 295, 356).

An evidentiary hearing was held on December 13, 2019 (Dkt. Nos. 382, 387), and continued to January 16, 2020 (Dkt. No. 383), and January 23, 2020 (Dkt. No. 384). Defendant filed a post-hearing memorandum in support of his suppression motions on February 20, 2020 (Dkt. No. 408). The Government filed a post-hearing memorandum in opposition on February 28, 2020. (Dkt. No. 420). On March 17, 2020, the Court issued a text order cancelling further oral argument on defendant's pretrial motions in light of the various state of emergency declarations concerning the impacts of the novel coronavirus and consistent with the General Order regarding Court Operations Under the Exigent

Circumstances Created by COVID-19. (Dkt. No. 428). Accordingly, the Court considered this matter submitted on the papers at that time.

## DISCUSSION

### Findings of Fact

During evidentiary hearings held on December 13, 2019, January 16, 2020, and January 23, 2020, the Court heard the testimony of Officer Sydney Wheeler, Lieutenant Robert Ward, Detective Jeremy Maggio, and Officer Thomas Cocker of the Jamestown Police Department.[1] The testimony of Officers Wheeler, Officer Cocker, and Lieutenant Ward related to events occurring in the late night of April 21, 2019 and early morning of April 22, 2019 at 49 Anderson Street in Jamestown, New York. The testimony of Officer Maggio related to the execution of search warrants for a black lock box recovered from the driveway of 49 Anderson and a 2003 Volkswagen Jetta seized from the driveway of that address.

On April 21, 2018, at approximately 11:53 p.m., Officer Wheeler received a call from Jamestown Police dispatch reporting a complaint of a male and female fighting in the area of 164 Anderson Street. (Tr. 1-1 at 12). Arriving to the area, Officer Wheeler saw an individual, Raymond Finch, attempting to use a jimmy tool to unlock the door of a car parked in the driveway of 49 Anderson Street. (*Id.* at 12). Officer Wheeler testified that she knows Finch from "work-related incidences." (*Id.* at 12-13). She stated that Finch was using the tool on the rear passenger door of a black Volkswagen Jetta sedan, which she

---

[1] Citations to "Tr. 1-1" refer to the portion of the transcript of the December 13, 2019 evidentiary hearing which was transcribed by Ann M. Sawyer, Court Report. (Dkt. No. 387). Citations to "Tr. 1-2" refer to the portion of the transcript of the continued hearing on December 13, 2019 which was transcribed by Christi A. Macri, Transcriber. (Dkt. No. 382). Citations to "Tr. 2" refer to the transcript of the January 16, 2020 evidentiary hearing. (Dkt. No. 383). Citations to "Tr. 3" refer to the transcript of the January 23, 2020 evidentiary hearing. (Dkt. No. 384).

viewed as suspicious behavior. (*Id.* at 13-14). Officer Wheeler approached Finch and asked who the car belonged to. (*Id.* at 15). He stated that it belonged to his friend, Alexis, but he did not know her last name. (*Id.*) Based on this, Officer Wheeler testified that the next step in her investigation was to locate Alexis. (*Id.*)

Approaching the garage of the house, Officer Wheeler observed "a big pile of clothes and other miscellaneous items" pushed up against the garage door. (*Id.* at 16-17; Gov't Ex. 4, Wheeler Body Cam, 23:59:36 – 00:01:00 [2]). She asked Finch where the items came from, and he said they came out of the car. (*Id.*) Wheeler testified that she then knocked on the garage door and Michael Baxter came out of a side door. (*Id.*). Wheeler did not know Baxter, but he identified himself as the owner of the house, and a cousin of Finch. (*Id.*). Baxter appeared confused and shocked by the activity and pile of items in his driveway. (Govt. Ex. 4, 00:00:11 – 00:00:55). Officer Wheeler inquired whose car it was, and Baxter responded that he did not know but it might belong to Alexis. (Govt. Ex. 4, 00:00:28). She testified that she asked Baxter if he knew where Alexis was, and he said he had not seen her for two hours. (Tr. 1-1 at 20). She also repeatedly asked Finch where Alexis was and if he had been fighting with Alexis. (Govt. Ex 4, 00:04:00 – 00:06:47). Finch stated he did not know where she was and denied fighting with her. (*Id.*). Wheeler also testified that she asked Finch how the pile of belongings came to be outside the vehicle, and his response was that he took them out of the vehicle. (Tr. 1-1 at 44). Officer Wheeler testified that she then observed a box of 9-millimeter ammunition in the pile of belongings. (Tr. 1-1 at 35; Govt Ex. 4, 00:08:27). Officer Wheeler explained her reasoning

---

[2] Officer Wheeler and Lieutenant Ward were equipped with body cameras during these events. The camera footage of Wheeler and Ward was admitted into evidence as Government Exhibits 4 and 8, respectively. The citations herein refer to the time stamped on the body camera recordings of each officer.

at this time was that she was called to the scene of a female and male fighting, and she was concerned for the safety of the woman in question. (Tr. 1-1 at 20).

Officer Wheeler testified that she then heard the noise of something falling or moving in the back room of the garage. (Tr. 1-1 at 20-21; 36). Baxter gave consent for her to go to the back room. (*Id.* at 21). Officer Wheeler stated that when she approached, she saw that the door to the room had a locking mechanism and a pad lock on it. (*Id.*) She attested that, based on the locking mechanism, the door was closed and locked from the outside. (*Id.* at 23). The padlock was not completely clicked closed, so Officer Wheeler was able to take the lock off and open the door. (*Id.* at 21). Officers Wheeler and Cocker entered the room and directed anyone inside to announce themselves. (*Id.* at 24). Officer Wheeler testified that an individual later identified as Alexis Hall, a co-defendant in this case, came out with her hands up. (*Id.*). Hall and Danny Michael, the defendant herein, both emerged from underneath a bench in the room. (*Id.*). Officer Wheeler observed that they appeared to have been hiding. (*Id.*)

The Court observes from the testimony and body camera footage admitted into evidence that were at least seven civilians present in and around the garage at 49 Anderson Street at this point. This count includes Finch, Baxter, Hall, Michael, two individuals seated in another car parked in the driveway, and an unidentified woman standing in the garage. It also appears that a total of four Jamestown Police Officers had arrived at the scene, namely, Officers Wheeler, Cocker, and Clark, and Lieutenant Ward.

After emerging from under the bench in the back room, Hall and Michael were handcuffed. (Govt Ex. 4, 00:11:46). Officer Wheeler testified that she was not arresting either individual at the time. (Tr. 1-1- at 39). Instead, she told them they were "just being

detained until we can figure out what's going on." (Tr. 1-1 at 39; Govt. Ex. 4, 00:11:30 –
00:11:42). Both Hall and Michael were patted down and no contraband was found on
either of them. (Tr. 1-1 at 85-86; Govt. Ex. 4, 00:11:46 – 00:12:20). Wheeler explained
that she was concerned about "the whole situation." (Tr. 1-1 at 40). She felt that lies were
being told and that someone had locked Hall and Michael in the back room where they
appeared to be hiding. (*Id.*). She believed at that time that Hall and Michael were the ones
engaged in a fight. (*Id.* at 42). Wheeler observed that Hall had a bloody, swollen lip and
other facial injuries. (*Id.* at 27; Govt. Ex. 3A-3E). Wheeler testified that Hall began to
explain what happened: that an unknown male punched her in the face multiple times.
(Tr. 1-1 at 42.) Michael was escorted out of the back room by Officer Cocker so that
Wheeler could speak with Hall alone. (*Id.*) Wheeler stated that the parties were separated
because that is what they normally do when someone is a suspect in a domestic violence
incident. (*Id.* at 28).

Wheeler testified that Hall then answered further questions about what had
occurred. (Tr. 1-1 at 28). Hall stated that she was outside by her car when an unknown
male came up, began punching her in the face, and then began ripping belongings out of
her car and throwing them on the ground. (*Id.*) Wheeler testified that Hall said Michael
had nothing to do with her assault, but Wheeler did not believe her. (*Id.* at 46). Wheeler
then questioned Hall about the ammunition she had observed in the driveway and asked
whether there was anything in the car or among the belongings that officers needed to be
concerned about. (*Id.* at 49). Wheeler testified that Hall stated there were airsoft guns and
that she did not think there was a rifle in the car, but if there was, she would claim
ownership of it. (*Id.* at 49, 55-56). After being asked again by Wheeler if a gun was present

in or around the car, Hall stated, "If anything, it would be out, if it was, it would be out in the stuff that was obviously where the ammunition came from." (Govt. Ex. 4, 00:41:50 – 00:42:05). Wheeler testified that Hall later inquired if she could "ask a hypothetical question." (*Id.* at 51). She asked whether owning a 9-millimeter that shoots blanks is illegal and if someone on parole or probation would be in trouble for having that. (*Id.* at 51, 57). Wheeler's testimony detailed a continued conversation with Hall about how Hall had been "hypothetically" cleaning a weapon and observed that it was plugged. (*Id.* at 51-52). She believed that this weapon was a practice gun that only shoots blanks but stated that another person, who the gun belonged to, believed that it was real. (*Id.* at 52). Wheeler attested that she understood that the person Hall was referring to was Michael. (*Id.*)

Wheeler also testified that Hall stated she owned the black Volkswagen Jetta vehicle and that the items in the driveway belonged to both her and Michael. (*Id.* at 57). Hall told Wheeler that Michael was her boyfriend and that their belongings were in the car because she and Michael were moving from one house to another. (*Id.* at 56-58).

Lieutenant Ward gave testimony to the Court that began at the time he responded to the scene of 49 Anderson and observed multiple people standing around a pile of clothes in front of a black car. (Tr. 1-2, pg. 19). Ward testified that upon arrival he saw a box of 9-millimeter ammunition in the pile of clothes. (*Id.* at 20). He further attested that he did not have to move anything to see the ammunition box. (*Id.*). Ward initially asked Finch about the ammunition and "if there was a 9-millimeter to go with that 9-millimeter ammo?" (*Id.* at 22-25; Govt Ex. 8, Ward Body Cam, 00:13:00 – 00:13:40). Finch replied, "No, I wish there was." (*Id.*). Finch stated that he had been moving the clothing out of the vehicle onto the driveway. (*Id.*). Ward then instructed another officer to pat down Finch

for weapons. (*Id.*) Finch initially claimed ownership of the box of ammunition, but he later recanted that after Ward cautioned him that he had been convicted of a felony. (Tr. 1-2 at 63-67; Govt. Ex. 8, 00:40:00 – 00:41:05).

Ward testified that shortly after that, Michael came out of the back room in handcuffs. (*Id.*). While Wheeler questioned Hall in the back room, Lieutenant Ward and Officer Cocker stood at the end of the driveway of 49 Anderson and questioned Michael. (*Id.* at 25). Ward testified that Michael was handcuffed for officer safety purposes and that although Michael was not being arrested at that point, he was not free to leave. (*Id.* at 26, 82). Ward attested that neither he, nor Officer Cocker, had their handguns drawn. (*Id.* at 78-79). Ward further testified that he did not read Michael his *Miranda* rights. (*Id.* at 82-83). Ward asked Michael basic questions about what was going on; whether Michael was involved in the assault incident; if another assailant was still nearby; if there were weapons in or around the car; and to whom the 9-millimeter ammunition belonged. (*Id.* at 26-29, 77-83; Govt. Ex. 8, 00:14:45 – 00:18:00). Michael stated to Ward that he heard a commotion, he came outside, and Hall was being assaulted by a male individual. (*Id.*). Michael believed the subject's name was Doug and that he was Hall's ex-boyfriend. (*Id.*) Ward asked Michael about the pile of clothing and other items in the driveway and Michael responded that some items belonged to him and some to Hall. (*Id.*). Michael further stated to Ward that the items were on the driveway because the assailant removed them from the car before running away down the street. (*Id.*). Michael stated that he was in Hall's car that day, but that there were no weapons in the car. (*Id.*) When asked about the ammunition on the ground, Michael replied, "well, she [Hall] hunts" and "I don't know what

she's got where she lives, but there's no guns in that car." (*Id.*) Michael further stated that

he was not hiding in the back room; he was "just comforting her [Hall]." (*Id.*).

Ward testified that although the handcuffs were removed from Michael shortly after

he interviewed him in the driveway about the assault, he was still concerned about officer

safety related to the pile of belongings. (Tr. 1-2 at 32-35). Immediately after speaking with

Michael, Ward walked back towards the garage and instructed Officer Clark to "stand

right here [by the pile], and keep those people corralled right there." (Govt. Ex. 8,

00:18:28). Ward then went into the back room to speak with Hall, who was still being

interviewed by Officer Wheeler. (*Id.*, at 00:18:40 – 00:38:00). Hall told Ward that she did

not know who assaulted her, but it was not Michael. (*Id.*, at 00:18:55 – 00:19:10). Hall

also stated that the ammunition found was not hers. (*Id.*, at 00:32:50). Ward stated at that

time that he knew the ammunition and other items came out of Hall's vehicle and believed

Michael could not legally be in possession of ammunition. (*Id.*, at 00:32:50 – 00:33:30).

Ward's testimony to the Court clarified that he knew that Michael was on probation and

thus was not allowed to possess a firearm or ammunition. (Tr. 1-2 at 42, 44-46, 72-74).

He also testified that shortly after speaking with Hall, he determined that Michael would

not be arrested for assault or domestic violence against Hall. (*Id.* at 41, 52). Officer Cocker

also testified that, at the time of these events, he knew Michael was a convicted felon

who could not possess a firearm or ammunition. (Tr. 2, pg. 53).

Officer Cocker further testified that during the investigation he stood in the open

garage near the pile of belongings. (Tr. 2 at 36-40). Cocker stated that there were at least

two officers and two or three civilians standing in that area. (*Id.*). Lieutenant Ward's body

camera footage shows that Finch, Baxter, Officer Clark and another Officer were standing

in the garage around the pile of belongings when Ward exited the back room. (Govt. Ex. 8, 00:38:15 – 00:38:25). The footage shows Michael standing nearby a few minutes later. (*Id.* at 00:41:24).

At about approximately 12:42 a.m., Lieutenant Ward determined that the pile of belongings in the driveway should be searched. (Govt. Ex. 8, 00:42:35 – 00:42:40). He stated to Officer Cocker, "Yeah, with that ammunition laying right there, we are checking it – fuck it." (*Id.*). Ward testified that he instructed Officer Cocker to conduct a search of the pile "to make sure there were not any weapons in there, specifically a handgun." (Tr. 1-2 at 36). He specified in his testimony that he thought the pile should be searched for weapons to ensure officer safety. (*Id.*). Ward then spoke with Michael and Michael again stated that some of the bags belonged to him and some to Hall, and added that other items belonged to a friend of Hall. (Govt. Ex. 8, 00:43:45 – 00:44:35). Ward advised him that because of the ammunition, they would be searching the pile. (*Id.*).

Officer Cocker and Lieutenant Ward carried out the search. (Tr. 1-2 at 37-38; Tr. 2 at 43-47; Govt. Ex. 2; Govt. Ex. 7). In the pile, the officers found a large flat box resembling a handgun case which contained three realistic looking "airsoft" or BB pellet guns, which Officer Cocker testified he believed to be real until they were investigated further. (Tr. 2 at 43-47, 85-86). They also recovered drug paraphernalia, specifically two digital scales with white residue, glassine bags, and other packaging materials. (Govt. Ex. 2; Govt. Ex. 7). Additionally, they found two large bowie-style knives, several smaller knives, .22 caliber ammunition, several rifle cartridges, numerous cell phones, computer equipment, surveillance cameras, and a black lock box with silver trim. (*Id.*). Officer Cocker testified that the black lock box was found inside a backpack located in the pile.

(Tr. 2 at 47). One of the digital scales was found in the same backpack. (*Id.*). Officer Cocker stated that based on his training and experience, he thought the scale was used for weighing narcotics and that, after finding it, he believed there might be other contraband in the pile. (*Id.* at 46-47). Officer Cocker testified that he tried to open the black lock box but was unable to do so. (Id. at 48). Officer Wheeler's report of the incident states that after confiscating the items, she and Officer Clark performed an inventory of the property at the police station. (Govt. Ex. 2). At that time, Officer Clark "was able to partially open the box and could observe a plastic baggy that looked to contain a crystal like substance consistent with methamphetamine." (Govt. Ex. 2). Lieutenant Ward's report of the incident confirms that while conducting inventory of the seized items at the Jamestown Police Department, the black lock box lid was about ¼ inch ajar when turned upside down. (Govt. Ex. 7). He further noted that officers observed a large bag that appeared to contain crystal methamphetamine. (*Id.*). Michael's felony probation paperwork was also found in the pile. (Tr. 1-1 at 36-39).

Michael was handcuffed at that time for possessing a firearm but was later charged with criminal possession of drug paraphernalia. (Tr. 2 at 55, 77; Govt. Ex. 7). Based on the investigation, statements of Hall, and ammunition and drug paraphernalia found, the lock box was seized and the Volkswagen Jetta was impounded to the Jamestown Police Department pending application for a search warrant. (Govt. Ex. 7). On April 23, 2018, Detective Maggio applied for a warrant to search the vehicle and lock box based on the police reports. (Tr. 1-2 at 84; Govt. Ex. 10). Two search warrants were issued by Jamestown City Court Judge Lamancuso authorizing searches of the vehicle and the black and silver lock box. (Tr. 1-2 at 84-89; Govt. Ex. 11; Govt. Ex. 13). The lock box was

found to contain 38 grams of methamphetamine and paraphernalia items. (Govt. Ex. 14). Inside the vehicle, officers recovered additional drug paraphernalia, a "9mm starter pistol," a Lakefield Mark II .22 caliber rifle, and $426 of U.S. currency. (Id.). The currency was found inside a backpack which also contained identification for Alexis Hall. (Id.). The rifle and other items were located in the trunk of the vehicle and were not within bags or containers. (Id.).

It is noted that after having the opportunity to listen to Officers Wheeler, Officer Cocker, Officer Maggio, and Lieutenant Ward and observe their demeanors during the hearing, the Court finds each of them to be wholly credible.

Conclusions of Law

The Court's findings as to defendant's motion to suppress physical evidence and preclude statements are detailed as follows.

## I.  **Motion to Suppress Physical Evidence**

Defendant argues that law enforcement searched the pile of belongings at 49 Anderson Street without a search warrant, without probable cause, and without consent. (Dkt. Nos. 251, ¶¶ 21-22; 408, pgs. 5-17). In the early hours of April 22, 2018, Jamestown Police officers conducted a warrantless search of belongings found in the driveway. That search revealed drug paraphernalia, three "airsoft" or BB pellet guns, various ammunition and ammunition cartridges, numerous cell phones, computer equipment, and a black lock box with silver trim, among other items. The black lock box and Volkswagen Jetta vehicle parked in the driveway were seized for further investigation. Defendant asserts that the initial search was illegal, therefore all items seized as a result of the search must be suppressed. In his post-hearing memorandum, defendant further contends that (1) the

ammunition found did not satisfy the plain view exception to the warrant requirement; and (2) the Government's justification of the search based on officer safety should fail because the search exceeded the scope of intrusion allowed under *Terry v. Ohio,* 392 U.S. 1 (1968). (Dkt. No. 408, pgs. 6-12, 13-17).

The following day, April 23, 2018, a Jamestown City Court Judge issued two warrants to search the black lock box and the vehicle. Defendant seeks to exclude the evidence recovered from those searches on the basis that no probable cause supported the issuance of either warrant. Defendant specifically moves to suppress a rifle found inside vehicle and a quantity of methamphetamine found inside the lock box. (Dkt. No. 251, ¶¶ 21-22).

The Government responds that no constitutional violations occurred against defendant. More specifically, it asserts that the officers had reasonable suspicion to investigate the alleged assault reported by the 911 caller and the possible vehicle break-in observed by Officer Wheeler at 49 Anderson Street. (Dkt. No. 420, pgs. 7-9). Further, it submits that the box of ammunition was recovered in plain view and rightly seized as evidence of a crime. (*Id.* at 10-12). The Government argues that after the ammunition was observed, the pile of items was justifiably searched based on concern for officer safety and a high degree of suspicion that concealed firearms may exist in the pile. (*Id.* at 12). Lastly, it contends that probable cause supported the issuance of both search warrants and that, even if probable cause were determined to be lacking, suppression

would be unwarranted because officers acted in good faith when executing the search warrants. (*Id.* at 13-16).[3]

    a.  *Standing*

      As a preliminary matter, the Court must first address the issue of defendant's standing to contest these searches. Defendant's supplemental affidavit fails to establish his standing to challenge the search of the Volkswagen Jetta, which the record shows was owned by co-defendant Hall. Defendant has asserted no ownership or possessory interest in the vehicle. He claims standing based on "a reasonable expectation of privacy and permission from Alexis [Hall]" to place his bags and personal belongings inside the car while moving from apartment to another. (Dkt. No. 356, ¶¶ 8-9). A mere passenger in the car who has no right to exclude others has no expectation of privacy in the vehicle. *See United States v. Paulino*, 850 F.2d 93, 96–97 (2d Cir. 1988); *accord Rakas v. Illinois*, 439 U.S. 128, 148 (1978) (holding that non-owner passengers in a private automobile do not have a reasonable expectation of privacy and thus cannot contest a search of the glove compartment and the area beneath the seats); *see also United States v. Leon*, 1994 U.S. Dist. LEXIS 14318, at *9 (S.D.N.Y. Oct. 6, 1994) (citing *Paulino*, 850 F.2d at 97) ("Generally, passengers are considered to have a lower expectation of privacy in the vehicle in which they are traveling, because, *inter alia*, they have no right to exclude others from the vehicle . . . and since the owner clearly has a greater expectation of privacy."). Defendant can only identify himself as a passenger and does not claim ownership or control of the vehicle. Further, the location of his personal items at the time of the search,

---

[3] The Government also asserts that the automobile exception to the warrant requirement would allow even a warrantless search of the Volkswagen vehicle. (*Id.* at 12-13). The Court does not address this assertion because the record shows the vehicle was not searched until a warrant had been obtained.

strewn in a driveway outside the vehicle, strongly suggests that defendant was presently excluded from the car, whether because of a fight with Hall or otherwise. Defendant has failed to establish a reasonable expectation of privacy in the vehicle and therefore cannot challenge the search of the vehicle or subsequent seizure of the rifle.[4]

Defendant's supplemental affidavit does establish standing to challenge the search of the black lock box with silver trim found to contain 38 grams of methamphetamine. The lock box was concealed inside one of several backpacks and bags located in the driveway at 49 Anderson Street. Defendant asserts that the lock box and the bag it was held in belonged to him. Defendants have a reasonable expectation of privacy in containers that are closed and conceal contents from plain view. *United States v. Ross*, 456 U.S. 798, 822-23 (1982). A container need not be locked or fastened shut for there to be a legitimate expectation of privacy, but those facts are emphasized when they exist. *United States v. Knoll*, 16 F.3d 1313, 1321 (2d Cir. 1994). Here, defendant submits that not only was the black box locked, the box itself was concealed within his closed bag. Based on these circumstances, defendant had a reasonable expectation of privacy in this item.

---

[4] The Court recognizes that passengers in vehicles which they do not own or rent may still have a legitimate expectation of privacy in closed containers they possess inside such vehicle. *See United States v. Bulluck*, 556 Fed. Appx. 18, 20 (2d Cir. 2014); *United States v. Sparks*, 287 Fed. Appx. 918, 920 (2d Cir. 2008) ("[P]assengers may nonetheless retain an actual, reasonable, socially recognized expectation of privacy in their luggage, even when it is transported in a vehicle driven by or shared with others."); *United States v. Perea*, 986 F.2d 633, 639-42 (2d Cir. 1993) (holding that defendant had no reasonable expectation of privacy in the trunk of a livery cab but did have a privacy interest in duffel bag found inside of trunk). Here, defendant has made a possessory claim over bags and personal items inside the vehicle (Dkt. No. 356, ¶¶ 8-9), but has not argued that any of his bags remaining in the car contained contraband or evidence that must be suppressed. It appears the only potentially incriminating evidence found concealed within a container in the car was cash located in a backpack. (Govt. Ex. 14). The police report states that Hall's identification was found in that same backpack, therefore it is does not appear that this backpack belonged to defendant. (Id.). Thus, defendant has not pointed to any incriminating evidence recovered from the Hall vehicle for which he has standing to challenge.

b. _Search of Pile of Belongings in the Driveway was Legal_

The Fourth Amendment protects individuals "against unreasonable searches and seizures." _United States v. Valentine_, 539 F.3d 88, 93 (2d Cir. 2008). A search or seizure carried out without a warrant is _per se_ unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of "exigent circumstances." _See Coolidge v. N.H._, 403 U.S. 443, 474-75 (1971). The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an "urgent need" to render aid or take action. _United States v. MacDonald_, 916 F.2d 766, 769 (2d Cir. 1990) (citing _Dorman v. United States_, 435 F.2d 385, 391 (D.C. Cir. 1970) (en banc). The test "is an objective one that turns on ... the totality of the circumstances confronting law enforcement agents in the particular case." _MacDonald_, 916 F.2d at 769. The Second Circuit adopted and summarized the following factors used in _Dorman_ as guideposts to determine exigent circumstances:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause . . . to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

_MacDonald_, 916 F.2d at 769-70. The _MacDonald_ decision emphasized that these factors are not exhaustive, and sometimes the presence of a single factor or a combination of factors suffices. _See_ 916 F.2d at 770. Further, the presence of an exigency does not give government officials unfettered license to conduct a generalized search for

16

evidence of criminal activity. *See United States v. Klump*, 536 F.3d 113, 118 (2d Cir. 2008). A warrantless search must instead be "strictly circumscribed by the exigencies which justify initiation." *Mincey v. Arizona*, 437 U.S. 385, 393 (1978) (quoting *Terry v. Ohio*, 392 U.S. 1, 25-26 (1968).

In this case, the Court concludes that the officer's warrantless search of bags and other belongings concealed within the pile of items on the driveway was justified based on probable cause and the exigencies of the circumstances. The Court finds that two particular exigencies, the risk of danger to others and destruction of evidence, as applicable to the situation met by officers at 49 Anderson Street. *See United States v. Jackson*, 778 F.2d 933, 937 (2d Cir. 1985) (danger to officers conducting a search); *see e.g., Kentucky v. King*, 563 U.S. 452, 460 (2011); *United States v. Schaper*, 903 F.2d 891, 894-95 (2d Cir. 1990); *United States v. Vasquez*, 638 F.2d 507, 529-31 (2d Cir. 1980) (need to prevent removal or destruction of evidence).

Applying the *MacDonald* factors to the circumstances here, it is apparent that the warrantless search for weapons and related contraband in a location outside of a residence was justified. Officer Wheeler first arrived to investigate possible domestic violence in the vicinity. She was drawn to that particular residence because she observed what looked like a car break-in and theft of personal property occurring. She observed a box of 9-millimeter ammunition in plain view among the possessions on the driveway. Shortly thereafter, she confirmed that an assault had occurred at that location based on statements of and physical injuries to the victim. Officers then learned that the handgun ammunition was among possessions belonging to defendant, a person known by them to have a prior felony conviction. The gravity of that offense, possession of ammunition by

a felon, is a serious one. Officers were also investigating whether defendant, or another individual in the area, had assaulted Hall, a circumstance that would create ongoing danger and risk of violent escalation if a weapon were present. Defendant was patted down to ensure he was not armed, but officers could reasonably believe that a prohibited weapon, specifically a 9-millimeter handgun, was loose in the vicinity or concealed among the pile of items in the open driveway. Further, defendant stated to officers that many of the items in the pile belonged to him. Co-defendant Hall, who said that some of the items also belonged to her, disclaimed knowledge of the ammunition.[5] Instead, she suggested to Officer Wheeler that defendant owned a 9-millimeter gun that she thought was a non-operable, practice gun. Based on this, officers had probable cause to believe that the ammunition found belonged to defendant in violation of the law based on his status as a convicted felon. They had further cause to suspect that a 9-millimeter weapon, operable or not, was among defendant's possessions in the driveway or inside the parked vehicle. The mere suspicion or probable cause for belief of the presence of a firearm does not, on its own, create urgency, but exigent circumstances are found where the firearm is one of multiple factors contributing to the exigency. *See Harris v. O'Hare*, 770 F.3d 224, 236 (2d. Cir. 2014). The various factors here created an urgent need for officers to secure the area, protect Hall from further violence, and, most compellingly, locate a handgun which they reasonably believed was illegally possessed by defendant and likely tossed haphazardly in a residential driveway.

---

[5] Raymond Finch, who was found standing near the pile of belonging, initially stated the ammunition was his, but recanted that statement immediately afterwards. The evidence shows that officers did not reasonably believe that the ammunition or any of the items in the driveway or vehicle belonged to Finch.

In addition to the *MacDonald* factors, federal courts have considered the additional factor of whether quick action is necessary to prevent the destruction of evidence. *See United States v. Moreno*, 701 F.3d 64, 73 (2d Cir. 2012) (citing *United States v. Brown*, 52 F.3d 415, 421 (2d Cir. 1995)). The need to prevent the imminent destruction of evidence has long been recognized as a sufficient justification for a warrantless search. *King*, 131 S. Ct. at 1856. Officers could have reasonably predicted the imminent destruction or removal of firearms and ammunition possessed by defendant soon after defendant realized an investigation would be commenced. *See United States v. Pelaez*, 961 F.Supp. 64, 67 (S.D.N.Y. 1997) ("[E]xigent circumstances permitted the agents to lawfully enter [defendants' store] because the agents […] reasonably believed that their surveillance operation has been uncovered and that important evidence was in immediate jeopardy of being destroyed or removed."). The bags suspected to contain such contraband had been moved just prior to the arrival of officers, and after having ammunition seized by officers, it is likely that defendant would have sought to destroy or disperse any related evidence of criminal activity among these possessions. Even if defendant was immediately arrested for possessing the ammunition, officers could reasonably conclude that the occupants of the house and other individuals present were capable of removing or destroying further evidence. *See Schaper*, 903 F.2d at 894-95.

Defendant argues that plain view doctrine does not apply to the seizure of the 9-millimeter ammunition because the incriminating nature of that evidence was not immediately apparent. He argues that officers did not have probable cause to believe that the ammunition was connected to anyone specific. Defendant also stresses that plain

view doctrine does not legitimize the broader search of the pile of clothing that was done by officers.

Under the plain view exception to the warrant requirement, police officers may seize property without a warrant if they are "lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and the officers have a lawful right of access to the object." *United States v. Reyes*, 283 F.3d 446, 468 (2d Cir. 2002). Seizures of illegal or evidentiary items in this context are authorized when an officer has probable cause to suspect that such items are connected with criminal activity. *See United States v. Gamble*, 388 F.3d 74, 76 (2d Cir. 2004) (citations omitted). Probable cause to search exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). Additionally, any contraband or other evidence of a crime seen in plain view during a circumscribed exigency search may be used to establish probable cause to obtain a warrant to conduct a broader search. *Klump*, 536 F.3d at 118 (citing *Mich. v. Clifford*, 464 U.S. 287, 294 (1984)).

Defendant does not dispute that officers were lawfully in a position to view the object in question but asserts that the incriminating nature of ammunition is not immediately apparent. He cites several district court cases holding that ammunition alone is not considered contraband unless it is linked to some criminal activity. *See United States v. Lemons*, 153 F.Supp.2d 948 (E.D. Wis. 2001); *United States v. Saari*, 88 F.Supp.2d 835 (W.D. Tenn. 1999); *United States v. Borno*, 946 F.Supp. 972 (M.D. Fla. 1996). Defendant ignores the testimonial and body camera evidence demonstrating that Lieutenant Ward and other responding officers were aware that he was on probation for

a felony conviction at the time. The incriminating nature of ammunition among the possession of a felon is immediately apparent and satisfies the requirements of the plain view doctrine. *See* 18 U.S.C. § 922(g) (prohibiting possession by a felon of any firearm or ammunition); *United States v. Jones*, 2014 U.S. Dist. LEXIS 37300, *39-40 (D. Conn. Mar. 21, 2014) (finding probable cause to search vehicle for evidence of a crime after ammunition was observed in plain view through window and officer knew that suspect was a convicted felon); *United States v. Hill*, 2005 U.S. Dist. LEXIS 31240, *31 (D. Conn. Nov. 18, 2005) (holding that plain view doctrine applied to bullets seized in the home of convicted felon "for whom possession of bullets would be illegal."). As discussed above, officers had clear cause to believe that the ammunition belonged to defendant based on his own statements and those of Hall.

Further, defendant offers that the amount of time between observing ammunition and searching the pile suggests the incriminating nature of the ammunition was not immediately apparent. He also argues that the actions of officers on the scene contradicts the assertion that they were concerned about their safety. The amount of time (less than 45 minutes) which passed between Officer Wheeler's first observation of the ammunition and the search of the pile does not affect the nature of the evidence in plain view. Moreover, the search was reasonably contemporaneous with the initial discovery of the contraband, and the exigency had not disappeared before the search commenced. Although when reviewing time delays for searches incident to arrest, courts have imposed relatively strict time requirements, this scenario is distinct from that context. *See generally United States v. Chadwick*, 433 U.S. 1, 15 (1977) (concluding that search of footlocker was not properly viewed as incident to arrest nor justified by any other exigency when it

occurred more than an hour after federal agents gained exclusive control of the item and "long after" respondents were securely placed in custody). Here, the facts are distinguishable because there was an ongoing and evolving investigation occurring in the time between initial discovery and search. Officers were certainly permitted to ensure their safety and the safety of bystanders by ascertaining if a firearm was strewn among the belongings in the driveway.

Defendant also claims that because officers allowed unhandcuffed civilians, including defendant, to stand near the pile of belongings, the Court must find that officers were not concerned about safety. This claim is countered by evidence showing that Lieutenant Ward directed Officer Clark to stand next to the pile and keep the civilians "corralled" away from the items while Ward continued to investigate whether criminal activity was occurring. Thus, the delay that occurred did not diffuse the exigencies of the situation and the conduct of law enforcement was consistent with their stated concerns for officer and civilian safety.[6]

Based upon the ammunition in plain view and drug paraphernalia found in the bags, it was appropriate for law enforcement to seize the black lock box for further investigation and application for a warrant. A container can be seized pending a warrant to search the contents of the item if officers have probable cause to believe it contains contraband or other evidence, and if exigent circumstances or another exception to the warrant requirement exists. *See United States v. Place*, 462 U.S. 696, 701 (1983). Additionally, a container may be seized briefly based on reasonable suspicion, for the

---

[6] Defendant also alleges that officers had ulterior motives for the search and investigation of defendant. The Court sees no evidence of such, but notes that, "a warrantless entry [or search] prompted by multi-purposes, one of which is a legitimate exigent circumstance, renders evidence seized admissible and not a violation of the [F]ourth [A]mendment." *United States v. Gallo-Roman*, 816 F.2d 76, 80 (2d Cir. 1987).

limited purpose of further investigation to quickly confirm or dispel that suspicion. *See Place,* 462 U.S. at 702. Here, officers discovered 9-millimeter ammunition, digital scales with residue, and packaging materials, which were all incriminating. Further, the lock box was found inside the same backpack as the digital scales. Officer Cocker testified that he believed the digital scale was used for weighing narcotics and suspected that there was associated contraband in the box. At that point, there was reasonable and articulable cause to suspect the box may have contained drugs or drug paraphernalia. The suspicious nature of the lock box was further explained by Detective Maggio in his search warrant application, which stated that "drug traffickers tend to use safes, lock boxes or hidden storage compartment to hide their drugs and drug paraphernalia." Based on exigent circumstances, it was justifiable for officers to seize the box at that time. After the initial seizure of the box, officers brought it back to the police station and observed that they could partially see the contents through a gap in the lid. They testified that the box appeared to contain a bag with a crystal substance inside. This observation increased their level of suspicion and confirmed their probable cause to suspect that the lock box contained contraband narcotics.

In sum, based on the incriminating nature of the ammunition observed in plain view among defendant's possessions, law enforcement had probable cause to believe that a handgun might also be present among the items. Exigent concerns of danger to others and officer safety, as well as risk of removal or destruction of evidence, justified the subsequent search of the pile for weapons without a warrant. The discovery of drug paraphernalia and a locked box inside a backpack in the pile gave officers reasonable suspicion, if not probable cause, to seize the box under exigent circumstances while

awaiting issuance of a warrant. The observations of a crystal substance through a gap in the box lid further confirmed that there was probable cause to believe the box contained evidence of a crime.

    c.  *Probable Cause Supported the Search Warrants*

Defendant challenges any evidence seized as a result the warranted search of the Volkswagen Jetta vehicle and black lock box. As already stated above, defendant has no standing to challenge the search warrant for the vehicle. With regard to the black box, the defendant does have standing to challenge, but for the reasons stated herein, the Court find that there was probable cause for issuance of the search warrant.

Upon a challenge to a probable cause finding made in a search warrant, a reviewing court must give deference to the issuing judge. *Illinois v. Gates*, 462 U.S. 213, 236 (1969). The court is not to conduct a de novo review nor is it to "interpret[] affidavit[s] in a hypertechnical, rather than a commonsense, manner." *Id.* Instead, the role of a reviewing court "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Id.* at 238 (internal citations omitted). To that end, warrant affidavits are entitled to "a presumption of validity." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). The Supreme Court has held that a defendant is entitled to an evidentiary hearing with respect to the validity of a search warrant only if they can make a substantial preliminary showing that: (1) the warrant affidavit contained a false statement; (2) the false statement was included intentionally or recklessly; and (3) the false statement was integral to the probable cause finding. 438 U.S. at 155-56.

No such showing has been made here. A search warrant issued by an impartial magistrate is presumptively valid. *United States v. Smith*, 9 F.3d 1007, 1012 (2d. Cir.

1993). Where, as here, the Court is reviewing the probable cause determination of an independent magistrate, it asks solely "whether the issuing judicial officer had a substantial basis for the finding of probable cause." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993). Doubts regarding the existence of probable cause should be resolved in favor of upholding the search warrant. *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983). Applying this standard of review to the warrant application, the Court has reviewed each application and finds that probable cause existed for the warrants. For these reasons, the Court recommends that defendant's request for suppression of evidence on these grounds be denied.

Defendant's motion to suppress should also be denied based on the "good faith exception" established in *United States v. Leon*, 468 U.S. 897 (1984). Under *Leon*, evidence seized pursuant to a challenged warrant is not subject to suppression so long as law enforcement acted with objective and reasonable good faith, even if the judicial officer erred in finding probable cause. *Id*. at 922. Here, for the reasons stated above, the Court finds that the law enforcement officers who executed the search warrants had a good faith basis to believe that the warrants were lawfully issued based upon a finding of probable cause. The warrant application certainly was "not 'so lacking in indicia of probable cause' that it was unreasonable for the officers to rely upon" them. *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (quoting Leon, 468 U.S. at 923). Thus, defendants' motion to suppress may also be denied on this alternative ground.

Accordingly, the Court recommends that defendant's motion to suppress physical evidence be denied for the foregoing reasons.

II.    **Motion to Preclude Statements**

Defendant moves to preclude incriminating statements he made to police in the driveway of 49 Anderson Street on or about April 22, 2020. (Dkt. No. 251, ¶¶ 17-20; 408, pgs. 17-20). He argues that his arrest and statements were the result of an illegal search and must be suppressed as fruits of the poisonous tree. This argument is foreclosed by the above analysis determining the legality of the search. Moreover, the statements made by defendant were independent of the search and cannot be considered the fruit of a poisonous tree. Defendant made incriminating statements prior to the contested search of the pile. His interrogation had ceased and he was no longer handcuffed at the time the search occurred. Such statements were not the result of the police action defendant claims was unconstitutional.

Alternately, defendant argues that his statements must be suppressed because he was subject to custodial interrogation by officers without being read his *Miranda* rights in violation of the Fifth Amendment. The Government initially objected that defendant's motion to preclude statements was facially deficient for lack of specific facts about the involuntary nature of his statement. (Dkt. No. 277, pgs. 8-9). Defendant subsequently filed an affidavit of standing which provides the necessary personal knowledge and standing to sustain this motion. (Dkt. No. 356). In its post-hearing memorandum, the Government has not put forth any further response in opposition to this argument. (Dkt. No. 420). Despite the Government's failure to provide a counterargument, the Court sees no constitutional violation.

A suspect in custody must be advised prior to any questioning "that he has the right to remain silent, that anything he says can be used against him in a court of law, that

he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). "Even absent the accused's invocation of [his *Miranda* rights], the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (second alteration in original) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

The *Miranda* Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. Here, there appears to be no dispute that the defendant was subjected to questioning by officers that amounted to "interrogation" under *Miranda*, but it is less obvious to determine if defendant was in "custody" at the time.

The test of whether a defendant was in "custody" is an objective one. *United States v. Hall*, 421 F.2d. 540, 544 (2d Cir. 1969). It asks whether a reasonable person in the defendant's position would have understood himself to be "subjected to restraints comparable to those associated with a formal arrest." *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992); *see also California v. Beleher*, 463 U.S. 1121, 1125 (1983). In the absence of actual arrest, an interrogation is not "custodial" unless the authorities affirmatively convey the message that the defendant is not free to leave. *Mitchell*, 966 F.2d at 98 (citations omitted). During a brief investigatory stop, such as a traffic stop, the Court should inquire whether a reasonable person would expect the detention to be

27

temporary and brief, and whether the circumstances would make the subject feel completely at the mercy of the police. *See Berkemer v. McCarty*, 468 U.S. 420, 437-49 (1984).

Among the facts generally deemed relevant to the inquiry of whether a reasonable person would feel subjected to restraint similar to formal arrest are: (1) the length of time involved in the stop; (2) its public or private setting; (3) the number of participating law enforcement officers; (4) the risk of danger presented by the person stopped; and (5) the display or use of physical force against the person stopped, including firearms, handcuffs, and leg irons. *See United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004).

Handcuffs are generally recognized as a hallmark of formal arrest. *See Newton*, 369 F.3d at 676 (citations omitted). In *Newton*, the Court concluded that the custodial status of a parolee temporarily handcuffed in his home during a search for a firearm was restrained to the same degree associated with formal arrest. *Id.* at 673-77. Officers arrived at Newton's home in response to a tip from Newton's mother that he had a gun stored in the house and had threatened to kill her. *Id.* at 663-64. Newton was placed in handcuffs in the hallway of the home. An officer told him he was not under arrest but was being restrained for his own safety and the safety of officers. *Id.* Newton was not advised of his *Miranda* rights. *Id.* He was then questioned by officers about the whereabouts of his mother and contraband in the home. *Id.* Newton made incriminating statements about possession of a gun and ammunition, and was subsequently arrested for a parole violation. *Id.* The Court concluded that a reasonable person in Newton's place would have understood that his interrogation was being conducted pursuant to arrest-like restraint. *Id.* at 677.

Here, the factors weigh in favor of a finding that defendant was subjected to restraints comparable to formal arrest. Similar to the circumstances in *Newton*, Lieutenant Ward's and Officer Wheeler's statements that defendant was only being detained and was not under arrest is countered by the use of physical force, i.e. handcuffs. The questioning was also relatively brief, lasting approximately 10 to 15 minutes. There were four officers at the scene, which is fewer than the six officers present during the investigation of Newton, but still a significant number of participating officers. In contrast, the defendant here was not restrained in the privacy a home, but in the public setting of a residential driveway. Defendant also posed a risk of danger to the officers in that he was a suspect in the assault of Alexis Hall and ammunition was observed in the pile of items he admitted belonged to him. Considering each of these factors, a reasonable person would have understood defendant's position to be akin to that of formal arrest. His temporary detention can be considered "custody" to which *Miranda* safeguards should have applied.

Just as the Second Circuit reasoned in *Newton*, though, this conclusion does not automatically compel suppression of the resulting unwarned statements. A limited exception to *Miranda* exists in circumstances where officers need to ask questions of a suspect to protect public safety or the safety of officers. *See New York v. Quarles*, 467 U.S. 649, 655-56 (1984). *Quarles* established the "public safety" exception for a "kaleidoscopic situation such as the one confronting these officers, where spontaneity rather than adherence to a police manual is necessarily the order of the day." *Id.* at 656. The public safety exception does not depend on the subjective motivation of the questioning officer. *Newton*, 369 F.3d at 677. It applies so long as the questioning "relates

29

to an objectively reasonable need to protect the police or the public from any immediate danger." *Id.* (quoting *Quarles*, 467 U.S. at 659 n.8). The exception is limited in that pre-*Miranda* questions, while "framed spontaneously in dangerous situations," may not be investigatory in nature or "designed solely to elicit testimonial evidence from a suspect." *United States v. Estrada*, 430 F.3d 606, 612 (2d Cir. 2005) (*quoting Newton*, 369 F.3d at 678, and *Quarles*, 467 U.S. at 658-59). The Second Circuit cautions against condoning pre-*Miranda* questioning as a routine matter and has advised that the totality of the circumstances must be carefully examined in each case. *See Estrada*, 430 F.3d at 612.

The Second Circuit has found the public safety exception applicable in situations where the presence of a missing weapon created a safety risk. *United States v. Fiseku*, 2015 U.S. Dist. LEXIS 162466, *41 (S.D.N.Y. Dec. 3, 2015), *aff'd* 906 F.3d 65 (2d Cir. 2018). *See Quarles*, 467 U.S. at 657 (applying *Miranda* exception where police interrogated defendant in order to ascertain whereabouts of a gun they believed he had discarded in a supermarket); *Newton*, 369 F.3d at 678 (ruling public safety exception covered even broad inquiries by the officer about contraband in general and the specific firearm they were looking for in the house); *United States v. Reyes*, 353 F.3d 148, 154 (2d Cir. 2003) (finding public safety exception applicable where officers had solid basis for belief that suspected narcotics dealer was armed and could be carrying, or reach for, a loaded weapon when arrested in a public location); *but see Fiseku*, 2015 U.S. Dist. LEXIS 162466 at *46 (holding that even though officers had reasonable suspicion to believe some crime was afoot after a suspicious interaction with defendant in a parked vehicle, the threat to public safety was attenuated and not dangerous enough to justify non-*Mirandized* custodial interrogation).

Here, the brief questioning of defendant while he was handcuffed in the driveway falls within the public safety exception to *Miranda*. While recognizing the narrow scope of the exception, the Court views the situation encountered by law enforcement at 29 Anderson Street as one of exigency which compelled officers to secure their own safety and assess ongoing danger to the public. The sequence of events bears repeating. Officers were first called to respond to a possible assault on the block. Upon arrival, they found an individual attempting to break into a vehicle. They then observed a pile of belongings strewn on the driveway, suggestive of a robbery, domestic incident, or other crime. Within minutes, officers discovered defendant and Hall hiding in a locked garage room. Hall had injuries to her face and offered a dubious explanation of assault by a random attacker. Officers were outnumbered by the possible suspects and bystanders present in and around the residence. Further, ammunition for a 9-millimeter handgun was plainly observed in the pile of belongings, and Hall posed cryptic questions about legal possession of firearms. These were dynamic circumstances which challenged officers to assess which parties posed an immediate threat to themselves or other civilians and ascertain if there were unsecured weapons. The questions posed to defendant sought to determine whether he or someone else was responsible for assaulting Hall and if there was a loose firearm belonging to him or another party. His interrogation was "reasonably prompted by concern for" officer and victim safety and the questioning was not "designed to solely elicit testimonial evidence." *See Reyes*, 353 F.3d at 155 (quoting *Quarles*). Therefore, this custodial interrogation qualifies as one not subject to *Miranda* warnings based on the public safety exception.

Accordingly, this Court recommends that defendant's motion to preclude statements from use as evidence be denied for the foregoing reasons.

## CONCLUSION

For the foregoing reasons, it is recommended that defendant's motions to suppress evidence and statements be denied. (Dkt. No. 251).

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ordered that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Vilardo, any objections to the recommendations portion of this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 59(b), 45(a), and 45(c) of the Federal Rules of Criminal Procedure, and Local Rule of Criminal Procedure 59. Any requests for an extension of this deadline must be made to Judge Vilardo.

***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.*** *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988)*.

*Pursuant to Local Rule of Criminal Procedure 59(c)(2), written objections "shall specifically identify the portions of the proposed findings and recommendations to which*

objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with these provisions may result in the District Court's refusal to consider the objection.**

**SO ORDERED**.

Dated: May 22, 2020
        Buffalo, New York

_____
MICHAEL J. ROEMER
United States Magistrate Judge

33